**EXHIBIT A**

| | |
|---|---|
| State of Illinois | ) |
| | ) ss |
| County of St. Clair | ) |

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF COMPLAINT FOR FORFEITURE**

I, Larry Brantley, declare under penalty of perjury the following:

At all relevant times, I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers.

1. On December 27, 2018, declarant and TFO Kyle Waddington (TFO Waddington) conducted a traffic stop on a gray Toyota Tundra bearing a California license plate for improper lane usage on Interstate 70 west bound at mile marker 18 in Madison County, Illinois. The vehicle returned to William Lee MANNS of Oregon House, California.

2. TFO Waddington approached the passenger side of the vehicle and made contact with the driver. As TFO Waddington informed the driver of the reason for the traffic stop and requested his driver's license, the driver informed TFO Waddington that his truck drifts back and forth because of the large tires. The driver provided a California driver's license, which identified the driver as William Lee MANNS. MANNS told TFO Waddington that he was on his way back to California from Cumberland, Maryland. MANNS stated he drove to Cumberland, Maryland to visit his family for Christmas. TFO Waddington asked MANNS when he left California and MANNS replied "around Christmastime." TFO Waddington asked MANNS when he left Maryland and MANNS again replied "around Christmastime." TFO Waddington asked MANNS

if MANNS could exit the vehicle and proceed to the passenger side of TFOs patrol vehicle to speak with TFOs. During the conversation with MANNS, TFO Waddington could smell the scent of burnt marihuana emitting from the passenger side window of MANNS vehicle.

3. TFO Waddington and MANNS returned to the patrol vehicle and allowed MANNS to sit in the front passenger side seat. Declarant began speaking with MANNS while running a query of MANN's information in law enforcement databases. The query returned showing MANNS had a history of drug charges, including a 2005 arrest for Possession of Marihuana and for Narcotic Equipment Possession; a 2007 arrest for Possession of Drug Paraphernalia, Narcotics Equipment Possession, Possession of a Controlled Substance, and Dangerous Drugs; a 2009 arrest for Possession of a Controlled Substance; a 2011 arrest for Possession of Hashish, Dangerous Drugs, Possession of a Controlled Substance (Peyote), Possession of Hallucinogens, Possession of Marihuana, Possession of Paraphernalia, and Possession of Narcotic Equipment; and a 2012 arrest for Possession of a Controlled Substance.

4. Declarant asked MANNS when he arrived in Cumberland, Maryland and MANNS stated that he did not know for sure because "everything is a blur." Declarant asked MANNS why everything is a blur and MANNS replied "just Christmas and my mom and family stuff." Declarant asked MANNS if everything was okay with his family and MANNS said "my mom has COPD and not doing well, and I'm just in a hurry to get home." Declarant asked why MANNS was in such a hurry to get home and MANNS said he didn't know. Declarant asked if MANNS had to get back to work or if MANNS had any other engagements back at home and MANNS replied "no, I don't work. I just want to get home." During the conversation with MANNS, declarant observed MANNS taking deep breaths and stuttering his speech. After observing the

2

nervousness from MANNS, combined with his criminal history and odd travel statements, the TFOs believed that MANNS could be involved in criminal activity.

5. Before completing the traffic stop with MANNS, declarant asked MANNS if there was anything illegal inside the vehicle and MANNS responded "no." Declarant asked MANNS about the odor of marihuana coming from the interior of the vehicle. MANNS told declarant that he smokes marihuana regularly and possesses a medical marihuana card from California. MANNS told declarant that he had not smoked marihuana since he left California. Declarant asked MANNS if he had ever smoked marihuana inside the vehicle and MANNS replied "yes, I have." Declarant asked MANNS more specific questions about contraband inside the vehicle. Declarant specifically asked MANNS separate questions regarding if there was any marihuana, cocaine, methamphetamines or heroin inside of the vehicle. MANNS denied having any of the above listed drugs inside of the vehicle. Declarant then asked MANNS if there were any large sums of United States currency inside the vehicle and MANNS laughed and said, "Not at all." Declarant asked MANNS if he and TFO Waddington could search the vehicle and MANNS said "I'm not sure about my rights are here." Declarant told MANNS that he has the right to give consent to search or to deny consent. MANNS said, "I'm just in a hurry to get home." Declarant replied that he and TFO Waddington would do a quick search to get MANNS back on his way as quickly as possible. MANNS replied, "go ahead and search."

6. TFO Waddington began a consent search on the vehicle while MANNS and declarant continued talking inside the TFO's patrol vehicle. After a short time searching the front passenger side compartment of the vehicle, TFO Waddington located a bundle of United States currency wrapped inside aluminum foil inside a backpack. TFO Waddington removed the

3

aluminum foil wrapped bundle of currency from the backpack and walked it back to MANNS. TFO Waddington handed the bundle of currency to MANNS and asked MANNS if there was any more currency in the vehicle. TFO Waddington continued speaking with MANNS while declarant exited the patrol vehicle and began searching the cargo area of MANNS truck. While speaking with TFO Waddington, MANNS stated he had a large amount of United States currency hidden inside of his luggage. TFO Waddington informed declarant about MANNS admission at which time MANNS said "oh, fuck!" Declarant opened the rear passenger side door of MANNS truck and located a red suitcase. Declarant began checking the suitcase and felt the inner liner had multiple bulges hidden inside. Declarant unzipped the liner and reached inside to find five aluminum foil bundles of United States currency. Declarant left the bundles inside of the suitcase and returned to TFO Waddington and MANNS. TFO Waddington secured handcuffs on MANNS and read MANNS his Miranda Rights.

7. TFO Waddington, witnessed by MANNS and declarant, collected the United States currency from MANNS' vehicle and placed it into an evidence bag. TFO Waddington then transported MANNS' vehicle to the Fairview Heights DEA Office to complete the search of MANNS' vehicle in a safe location. Declarant followed TFO Waddington and transported MANNS and the seized currency. While en-route to the DEA Office, MANNS said "forty-seven thousand." Declarant asked MANNS what he meant. MANNS repeated "forty-seven thousand. That's how much money I have. Forty-seven thousand." Declarant asked MANNS where he got the money and MANNS stated that multiple family members gave him the money while he was visiting them for Christmas. MANNS said he was going to buy a plot of land for his family to have and to use for hunting and fishing. Declarant asked if MANNS' mother gave him money and

MANNS replied "yes." Declarant asked MANNS how much money his mother gave him and MANNS said he did not know. Declarant asked MANNS where the plot of land he was going to purchase was located and MANNS said, "I don't know. Maybe in Montana or Idaho. I'm still working on that."

8. Upon arrival at the DEA Office, TFO Waddington parked MANNS' vehicle and escorted MANNS into the building. A short time later Group Supervisor Robert Eisenbarger (GS Eisenbarger) and Special Agent Jarret Neff (SA Neff) began a recorded interview with MANNS.

9. At the beginning of the interview MANNS was reminded of his rights per Miranda, which were previously read to him by TFO Waddington. MANNS stated he was traveling from Northern California to the Maryland/West Virginia border to visit family for the Christmas holiday. MANNS advised he believed he left California on December 15, 2018 and arrived in Maryland approximately four days later. MANNS further advised while at his family's residence he participated in holiday activities before departing on December 26, 2018, and spending the night in Effingham, Illinois. MANNS advised the last time he traveled to Maryland was around July 4, 2018; however he did not remember how long he stayed, but believed it to be approximately 2 to 3 days.

10. SA Neff asked MANNS the reason for the traffic stop. MANNS advised he may have been swerving prior to being stopped by police because he had been fighting wind conditions while he was traveling on the interstate. MANNS further advised the TFOs told him they could smell marihuana, however MANNS stated that he had not had marihuana since leaving California. MANNS further stated that he had a medical marihuana card through California, however it had expired in November.

11. MANNS stated that he has not made more than $15,000 per year throughout his entire life. MANNS further stated that he has not filed taxes within the past five years. MANNS stated he does not currently receive any additional income, however he works side jobs to make money.

12. MANNS stated that the truck (2017 Toyota Tundra) he was driving when stopped by the TFOs was registered to him and purchased by him in Auburn, California at Auburn Toyota. MANNS stated he had saved money for approximately eight years to purchase the truck with cash, being approximately $40,000.

13. MANNS advised he had been arrested approximately 7 to 8 years ago in Utah for possession of marihuana and Peyote. MANNS stated he eventually pled guilty to a felony offense, being the Peyote, and was sentenced to ten days in jail.

14. SA Neff then asked MANNS about the United States currency located inside of his vehicle. MANNS stated that the United States currency was inside a suitcase, wrapped in aluminum foil, along with miscellaneous clothes. MANNS originally stated that the United States currency belonged to him and his stepfather, Brian Divelbliss. MANNS further stated that the United States currency was going to be used to purchase land in Montana for his family. MANNS stated after receiving the United States currency he took money out of the large sum to pay for his expenses for traveling to Maryland. As the interview continued, MANNS changed his statement and advised that the United States currency belonged to only him and not his stepfather.

15. MANNS advised that he is currently renting a room for $400 per month in California, however he did not wish to provide his landlords information. MANNS further advised that he had approximately $1,000 to $2,000 to his name. MANNS stated he has received United

6

States currency in the past from Divelbliss in the sum of approximately $1,000 to $2,000.

16. During the interview, SA Neff and GS Eisenbarger requested consent to search MANNS cellular telephone, which MANNS provided. However, when agents briefly exited the interview room, MANNS was observed deleting text messages from his cellular device. MANNS advised he deleted text messages from his mother because he was nervous.

17. Prior to the completion of the interview, MANNS advised that the United States currency was his and he did not want his family in trouble. MANNS said "this is all on me." MANNS later stated he knows he should not say anything further and requested a lawyer be present prior to answering any further questions. At that time the interview was ended.

18. During this same time, DEA Resident Agent in Charge Michael Rehg (RAC Rehg) and Internal Revenue Service Special Agent Jason Bamvakais (SA Bamvakais) conducted a telephone interview of Brian Divelbliss. At the onset of the interview, RAC Rehg identified himself to Divelbliss and explained that agents wanted to speak with him about his stepson, William Lee MANNS. Divelbliss confirmed MANNS was his stepson, but stated that he is "not really on talking terms" with MANNS. Divelbliss stated that he and MANNS' mother, Susan Divelbliss, live in Rawlings, Maryland and have been married for approximately thirteen years. Divelbliss confirmed that MANNS recently visited them for one night, around Christmas, and left on Christmas Eve to travel back to California. Divelbliss was not aware of MANNS having any drugs or large amounts of United States currency during the recent visit. Divelbliss stated MANNS lost his wallet at a restaurant during his visit and asked to borrow $500 for his trip back to California. Divelbliss stated that MANNS found his wallet at the restaurant the next day and that was the last time Divelbliss heard from MANNS.

7

19. Divelbliss stated that he did not give any money to MANNS. Divelbliss said there was "no way" MANNS' mother could have given MANNS $40,000 to $50,000 because she never had that much money. When asked if Divelbliss and his wife had "that type of money" to give someone, Divelbliss responded "hell no."

20. TFO Waddington contacted Caseyville Police Department K9 Officer Cody Wiley (K9 Officer Wiley) to conduct a K9 sniff on the seized currency. Prior to K9 Officer Wiley's arrival, TFOs Brantley and Waddington placed the seized currency into a clean unused paper bag and placed the bag along a wall in the DEA Office along with three other bags. K9 Dallas appeared distracted and not focused on the sniff. K9 Dallas did not give a definitive indication on any of the bags. Due to the invalid sniff by K9 Dallas, TFO Waddington made arrangements with Madison County K9 Deputy Kyle Doolen (K9 Deputy Doolen) to perform a sniff on December 28, 2018.

21. On December 28, 2018, K9 Deputy Doolen conducted a K9 sniff on the seized currency. TFO Michael Reichert (TFO Reichert) and TFO Timothy Lay (TFO Lay) set up four clean unused paper bags for the sniff and placed the bags along an unused wall in the hallway (near the stairs) outside of the DEA Office. TFOs retrieved the seized currency from the temporary evidence vault and placed it in the first bag (closest to the stairway). K9 Deputy Doolen arrived a short time later and used the stairs to reach the hallway where the bags were set up. K9 Deputy Doolen held K9 Havoc at the top of the stairs for about 15 seconds prior to beginning the search. While waiting to begin the search, K9 Deputy Doolen observed K9 Havoc display signs indicating K9 Havoc detected narcotic odor. K9 Deputy Doolen observed K9 Havoc's breathing quicken as he stretched his head and neck trying to get closer to the bag so he could put his nose on what was

inside. K9 Deputy Doolen attempted to get K9 Havoc to leave the bag and odor but he would not, indicating the bag was the source of narcotic odor. K9 Deputy Doolen advised TFOs of the final alert, which was on the bag containing the seized currency.

22. Immediately after the conclusion of the K9 sniff, TFO Reichert and TFO Lay transported the seized currency to Loomis for an official count. The total currency seized totaled $47,000.00.

23. Based on the foregoing, declarant further believes that the subject-matter $47,000.00 in United States Currency is property which constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. § 801 *et seq.*

24. Based on the foregoing, declarant believes that the 2017 Toyota Tundra, VIN: 5TFCY5F1XHX021699, with all accessories, attachments and components thereon constitutes a conveyance which was used or intended to be used, to transport, or in any manner to facilitate the transportation, sale, receipt, possession or concealment of a controlled substance, and is thus subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(4).

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of May, 2019.

TFO _____
LARRY BRANTLEY
Task Force Officer
Drug Enforcement Administration